Eastern District of Kentucky
**F I L E D**

JUN 0 4 2013

AT FRANKFORT
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

**UNITED STATES OF AMERICA**

V.

**INFORMATION NO.** *13-9*
**18 U.S.C. § 1035**

**SANDESH RAJARAM PATIL**

\*    \*    \*    \*    \*

**THE UNITED STATES ATTORNEY CHARGES:**

At all times relevant to this Information:

**A.      Dr. Patil and his medical practice**

1.      **SANDESH PATIL** was a licensed cardiologist in the Commonwealth of Kentucky.   **PATIL** is board certified in cardiology, interventional cardiology, and internal medicine.

2.      **PATIL** was employed by The Medical Specialists of Kentucky, P.S.C., who in turn leased **PATIL's** medical services to Cumberland Clinic, P.L.L.C.

3.      Cumberland Clinic, P.L.L.C. entered into a professional services agreement with Saint Joseph Health System, d/b/a Saint Joseph London, effective August 1, 2008.

4.      Pursuant to the professional services agreement, **PATIL's** billing rights were assigned to Saint Joseph London.   Saint Joseph London, through its billing contractor, submitted claims for **PATIL's** services to Medicare and Medicaid.

**B.      Medicare and Medicaid**

5.      Medicare is a health care benefit program under 18. U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.

6.      Medicare Part A (Hospital Insurance) helped cover, among other things, inpatient care in hospitals.   Medicare Part A covered 100% of medically necessary inpatient hospital care, including medically necessary testing.   Beneficiaries were required to meet certain conditions to get these benefits.

7.      Medicare Part B (Medical Insurance) helped cover doctors' services, outpatient care, and supplies, when they are ordered by a doctor and are medically necessary.   Medicare Part B paid for 80% of the allowed amount of medically necessary physician services, outpatient services and other medical services.   The remaining 20% of the Part B charges were to be paid by the Medicare beneficiary.

8.      Medicaid was a health care benefit program under 18 U.S.C. § 24(b). Medicaid is jointly funded by the Commonwealth of Kentucky and the federal government.   Claims for Medicaid beneficiaries were sent to the fiscal agent for the Kentucky Medicaid Management Information System for payment.   Beneficiaries were required to meet certain conditions to get these benefits.

9.      The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs.   CMS had the

2

authority to make coverage and medical necessity determinations.

10.     At all times relevant, Medicare and Medicaid prohibited payment for items and services that were not "reasonable and necessary" for the diagnosis and treatment of an illness or injury.   Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."

11.     Federal regulations require that healthcare practitioners provide services which are provided economically and only when, and to the extent, medically necessary; are of a quality which meets professionally recognized standards of healthcare; and are supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities.   42 U.S.C. § 1395y(a)(1)(A).

12.     **PATIL** provided services to Medicare and Medicaid beneficiaries.

**C.     Cardiac Disease, Diagnosis and Treatment**

13.     Coronary arterial circulation of blood is fundamental to the functioning of the human heart.   Atherosclerosis is the process by which plaque builds up in the arteries. The coronary arteries supply blood to the heart and can become narrowed or blocked by this accumulation.   These plaques can restrict blood flow to the heart muscle by physically clogging the artery or by causing abnormal artery tone and function.   This narrowing of the arteries is referred to as a "lesion" or "stenosis".

14.     Myocardial ischemia, or lack of blood flow and oxygen to the heart, can

result from this narrowing and can be associated with chest pain or discomfort, referred to as angina.

15.     Cardiologists perform a variety of testing to assess, treat and diagnose patients with suspected heart related issues, including coronary artery disease. Preliminary testing includes procedures such as a history and physical, electrocardiogram, echocardiogram, stress testing, nuclear stress testing and blood work.   More invasive testing includes cardiac catheterization.

16.     Cardiac catheterization is an invasive imaging procedure that is used by a doctor to evaluate, among other things, the presence of coronary artery disease, and to determine the need for further treatment.   During a cardiac catheterization, a long, narrow tube called a catheter is inserted into a blood vessel in the arm or leg.   The catheter is guided through the blood vessel to the coronary arteries with the aid of an x-ray machine. Contrast material is injected through the catheter and x-rays are created as the contrast material moves through the heart's chambers, valves and vessels.   The part of the x-ray made of the coronary artery is called a coronary angiogram.

17.     A cardiac stent is a device placed in a coronary artery to treat coronary artery disease as part of a procedure called percutaneous coronary intervention ("PCI").   During this procedure, a catheter with a balloon is threaded through an artery in the groin up to the site of the narrowed coronary artery.   The stent is usually placed at the tip of the catheter, over the balloon. Once in place, the balloon is inflated to push the plaque outward against the wall of the artery, widening the artery and restoring the flow of blood through it. Once

4

the stent is open, the balloon is deflated and removed.   The stent is then left behind to hold the artery open.

18.     Medicare and Medicaid would not pay for a coronary stent that is not "medically necessary."   At all relevant times, it was generally accepted within the cardiac community that a coronary stent was not "medically necessary" absent a diagnosis of a least a 70% lesion and symptoms of blockage.

19.     When a patient is undergoing a cardiac catheterization or stent, a medical provider must accurately document and maintain a medical record of his findings for treatment of the patient, any intervention and subsequent reimbursement.   **PATIL** documented his findings in medical records such as "Interventional Procedure Reports" and "Cardiac Catheterization Reports."

20.     Medicare and Medicaid had the authority to conduct reviews of claims for medical necessity and to require the provider of services to produce medical records to support any claim made.   A review of medical records enabled Medicare and Medicaid to confirm that the services furnished were reflected on the claim as well as the medical necessity of the services provided.   A documented lesion of 70% or greater would be deemed medically necessary for PCI and the claim would be paid.

### The Charge

On or about February 19, 2009, in the Eastern District of Kentucky,

### SANDESH RAJARAM PATIL,

in a matter involving a health care benefit program, did knowingly and willfully make a

5

materially false, fictitious and fraudulent statement and representation, and make and use

any materially false writing and document knowing the same to contain any materially

false, fictitious and fraudulent statement and entry, in connection with the delivery of and

payment for health care benefits, items and services; that is, **PATIL** caused an entry in the

Medical Record of Patient B.D. to state that the lesion in B.D.'s left circumflex artery was

70%, well knowing that the medical record contained a materially false, fictitious and

fraudulent statement and entry, in that the lesion was substantially less than 70%.

All in violation of 18 U.S.C. § 1035(a)(2).


**KERRY B. HARVEY**
**UNITED STATES ATTORNEY**

6

## **PENALTIES**

Not more than 5 years imprisonment, $250,000 fine, and 3 years supervised release.

**PLUS:**    Mandatory special assessment of $100.

**PLUS:**    Restitution, if applicable.